15 0554 people of the state of Illinois, Abilene by Gary Bonetovic v. Jerry Nichols, appointed by William Worobet. Mr. Worobet. Good afternoon, your honors. May it please the court, counsel. My name is Bill Worobet. I'm the attorney for the respondent, defendant in this case, Mr. Jerry Nichols. I'm going to take the time today, your honors, while I put three arguments in my brief, I'm going to focus on two of the arguments primarily, at least that's what I prepared for today, that being the ineffective assistance claim and the lesser included offense claim. I'm actually going to take them slightly out of order than what I wrote them in the brief and start with the ineffective assistance of counsel claim. As I was preparing for today's Obviously, I went back and read the briefs on this case and I know your honors certainly read the briefs and are familiar with them as well. And after having the benefit of some time, some months past since I wrote and read the state's briefs, wrote my own and read the state's briefs, it occurred to me that I think, at least myself and maybe even all of the briefs, I think we kind of meandered away from the issue a little bit and I want to bring it back into focus here real fast. The issue, our issue is not whether or not it was ineffective assistance for defense counsel to not call Dr. Wasilu, the expert on post-traumatic stress disorder. The issue is once he promised it to the jury and didn't present Dr. Wasilu, his failure to communicate a reason to the jury, that's where the ineffective assistance of counsel came in. It was that omission of explaining to the jury and taking the step of why, after I promised you this witness is going to testify and what he's going to say, why he then didn't present that witness. That's where the prejudice came in and that's what our position is on this. Now, the state's evidence in the case, and I acknowledge I'm vastly summarizing this just for purposes of making a point here, but their case was that the defendant drove his car into his wife, into the back wall of the garage hard enough to push her at least partially through the garage. The first responder to the scene saw him stomping or kicking on her head when he arrived and that the defendant gave multiple versions of the events during his video statement and talking to other various witnesses on the scene as well. Those were the three main things, at least in my mind, that the jury walked away with on the state's case. The defendant did an accidental or reckless act with no intent to kill her and that the subsequent kicking or stomping on her head that the first responder saw was the result of a PTSD, post-traumatic stress disorder, episode. We know this was the theory of the case because that's exactly what he described in the opening statements. And as pertinent to this issue, I think it's important to look at exactly what counsel said during his opening statements. He was very specific. It wasn't a glancing vague reference or a wait and see kind of thing. He said who it was going to be. He named him. Dr. Wassilou was going to testify. He said what he would say. He was going to testify about PTSD. He actually began bolstering the credibility of the doctor by telling them he's written articles on this subject before he had even testified yet. He told them the cause of the defendant's PTSD being the issue in Vietnam when he had a close friend die in his arms after a leg was blown off. And then he applied the issue of PTSD to the facts and told the jury, again, all in opening statements, that the doctor will testify that the PTSD caused the defendant to kick and stomp his wife because he couldn't handle stress and for causing her injuries. He was extremely explicit in all of these things. He told the jury everything short of telling them what time he was going to testify and what he was going to be wearing. He laid everything out. And yet when it came, excuse me, at the close of openings, the jury had basically been informed by the defense that despite this description, the defendant stomping on his wife's head, we have an explanation for that. Get ready. There's an explanation coming and here's the person who's going to come. Here's what he's trained in. Here's what he's going to tell you. Yet when it came to their case and the opportunity came up and the transcript showed us, Judge Carlson looked at him and said, have you made a decision? Are you calling Dr. Wassilou? He said, no, no we're not. And that was the end of the discussion as to Dr. Wassilou for the rest of this trial. No more, there were no comments made to the jury by counsel explaining why that witness wouldn't testify. No further discussion with the court why he wouldn't testify. That was it. It was a dead issue. And as I cited in my brief, I cited a couple of cases, two primarily Briones and Wiebach. When defense counsel promises the jury in opening statements that a witness will testify and then fails to present that witness, the failure may constitute an effect of assistance. In this case, where do you think you're going to find a jury that's going to buy that story? Buy the story that it was PTSD? That he accidentally ran over and then it was just some mental kind of physical illness that caused him to be stomping on her head when the first responder walked in. Well, here's the thing, Your Honor. I don't know that that matters. Because the issue is him, the defense counsel, not executing on a promise to call the witness. But the issue is also an effect of assistance. This is prejudice. In other words, but for counsel's alleged missteps, is it likely the result would have been different? And where are you going to find a jury that's going to buy that? Well, here's the thing. I don't know what Dr. Westman would have said in real life. I don't know what he would have said on the stand. I know what the court said that was contained within the record. I'm not going to try and predict what juries are going to decide. If they're 20-something years of doing this, I can't predict anymore what juries are going to happen, all right? And I don't know how credible he would come off as. But I do know that you've planted the seed in their head before the trial and said, get ready. We've got an explanation for this. And the jury's sitting there saying, okay, now we've got a ballgame. And then when you don't call him, they're left with defendant drove her through the wall, stomped on her head. I hear things about PTSD, but you're not helping me out here. And that's a – it's a very intricate term. There's a lot of – it's not just as simple as everybody knows what PTSD is. It's not that simple. I understand that. But that's step one in your ineffective assistance. Step two is to say that, but for counsel's errors, those probably would have been different. And so I'd like you to try to jump that hurdle for me. Okay. Here's – and I will admit I struggled with this in the beginning as well. And here's what I've come up with, okay? And when I say that, I don't mean like, here's my spin. Here's what I ended up deciding in this case as I was going through it. I think the answer, strangely enough, lies in what the standard of review is, incited in this case, okay? The – actually, strike that. Hold on. I'm jumping ahead of myself. I'm jumping ahead of myself. I'm actually jumping into my next argument. I apologize. The prejudice comes – and I think this is what's – here we go. This is what's laid out in Brionis' leadback. The prejudice comes that once you promise this to the jury, okay, and then you don't execute on that, the jury's left with a bad taste in their mouth. They look at the defense attorney as, why should I believe anything this guy said? Was he lying to us? Did he never have this witness? Did the witness flip, causing the jury to think, all right, maybe that's not the truth after all. Maybe that's not the issue, okay? That's where the prejudice comes in, in my mind. Once you don't – and actually, according to the case law, not just my mind. Once you describe to the jury that this is going to happen and then you don't execute on it, as the leadback court said, in no sense does it serve the defendant's interest when you don't explain why that evidence didn't come in. There's no – every one of these cases discusses – it talks about that it's implied that there's going to be a prejudice there. And it's not just a simple issue that he blanks over. It was the linchpin of his whole defense. Well, let me just say that by announcing, I'm going to call expert X, and here's what he or she is going to say, and then not calling is – and not coming to explain why you didn't call is that by itself is ineffective assistance and meets all the standards and reversible, regardless of facts and case. I think it's – if anything, it's case by case. I'm hesitant to make a blanket statement because I'm sure I could sit here and we could both come up with other examples, but in this case, yes, I think it is. Well, we're saying talk about this case. Yes. Do you think even if that witness had testified, it would make one or the other a difference? I think it could have, certainly. I absolutely do, and I'll tell you why. Once he – it wasn't just – okay, okay, if he would have gotten the PTSD information through his expert, okay, now the jury can also look at – and if I'm the attorney, I'm going to start arguing – let's look at what he did immediately after the accident occurred, the collision occurred. He called 911. He started performing CPR. He ran next door to the house where he knows a nurse lives, ran over there to try and find a nurse to help him. The – all the first responders stated that he appeared distressed when they saw him. He actually had a knife in his pocket that the officers recovered from him. Happily, however, he didn't use the knife. These are not the actions of a man who was intending to kill his wife. Well, in other words, they're not the actions of a guy who wants to make it look like he intended to kill his wife. Could be, but that's issues for the jury. And I think the PTSD testimony and evidence through an expert who, as the attorney said, has written papers on this and is an expert on this and here's what he's going to say, that testimony, yeah, I think that could have had an effect. Absolutely. Absolutely. Based on all the other surrounding circumstances and the fact that the defense said they were – and all evidence pointed to that they were getting along well that morning, laughing, playing, joking, shopping together, nothing controverting that. By all accounts, it looked like an accident. The one thing in this whole transaction or this whole sequence of events that makes it look not like an accident is when the first responder sees him snapping on her head. And if that is attributable to PTSD and not just some layperson like me standing there saying, trust me, it's PTSD, but an actual expert saying, look, let me tell you about PTSD, I'll tell you what it is, how it works, here's how it manifests itself, here's how it manifested itself in this event, yeah, I think that has an effect. And I think the failure to – not just the failure to call him, but the failure to explain to the jury, you know, here's – I know I told you we're going to call him, here's why we didn't call him, I think that's hugely prejudicial. And I think especially in a case where the defendant doesn't testify and his attorney is basically his mouthpiece in the case, I think the attorney looks bad and accordingly the defendant looks bad. And I think once that witness wasn't called, I think everything, without an explanation, beyond that I think everything looks bad and they're done listening. Two minutes, please. Okay, with that I'm going to jump real quick into the reckless, and here's how I'll summarize that real quick in two minutes. I think I laid it out pretty well in the brief. I know you know what my argument is on this. Here's the bottom line. I would argue first two things. First, or actually either or, first I believe there is absolutely some evidence of reckless conduct, reckless homicide. All right? Number one, despite what the court found, what the state argued in their brief, I believe, I would argue it's one continuous action. Starting to quote-unquote play with her with a two-ton automobile set in course the chain of events that caused the ultimate death of her. Okay? The judge talked about an intervening factor, I understand that. But without the initial act that was reckless of playing with her with a car, if it weren't for that he wouldn't have been in the situation where he nudged her accidentally, recklessly, and then all of a sudden set in a series of events where he panicked, and depending what version you take, whether he hit the gear shift, hit the brake, hit the gas, whatever, all those actions resulted as a result of him panicking from the initial reckless act of playing with a two-ton automobile. Even if, your honors, disagree with me that it's not one continuous act, I would point to the fact that there actually is a statement that the defendant made in those transcripts from the tape. You can see, I'll quote it real fast here, the final, I counted four versions that he gave in that video confession, and the final version he said there wasn't enough room in front of the car for his wife to pass, so he backed it up, quote, and I thought, heck, I'll just play with her. This is on supplemental E-281 in the record, just to draw attention to it. As she walked back in front of his car, he said, I thought I had just lurched the car, and my foot slipped off the brake, and it hit her. He stated he knew he hit her because he heard her say, back it up, but he thought he had just nudged her. He then stated, quote, then I backed it up, and she looked at me, and I went to, I just sort of, you know, just played, and the car took off. Judge Carlson at the trial level focused on the fact, in fact, he outright said, unless you're going to tell me that the second collision was somehow him continuing to play, I wouldn't even consider giving this jury instruction. I'm paraphrasing. But he said, unless you can show me or point to some evidence that he was just playing, I'm not even going to consider it. Here is your evidence. If you disagree with me that it's not one continuous act, that statement that he made, and it's in the transcripts from the DVD of his video statements, he said, I just sort of, you know, just play, and the car took off. That's telling you, although not very eloquently, that's telling you he was still in his mind playing with her. Now, whether or not you believe that, whether or not I believe that, in my opinion that doesn't matter. The issue is whether there is some evidence to let that get to the jury. I think the case law is clear that it's either some evidence or no evidence, and I'd argue that it's the some evidence. Thank you. Thank you, counsel. Mr. Ganitovi, you need to get a drink of water before you start. Hopefully not. I don't think so. Sorry about that. May it please the court, counsel. What I'm going to try to do here is I'm going to try to take and kind of marry both issues together because they kind of sort of go together, even though one's ineffective assistance with PTSD and the other one is reckless homicide. The defendant here was charged with two counts of murder originally, reckless homicide and domestic battery. The latter two charges were now processed and went to trial just on the two counts of first degree murder. The trial judge, when requested to take and give an instruction on reckless homicide, denied it, finding that there was no evidence. The evidence here showed either an intent or strong probability based on his conduct or this is a pure accident. There was no reckless conduct whatsoever. In this case, as counsel has kind of related the facts, they show that the defendant wanted to take and have some fun with his wife by using his car. And what happened is we accept what he says is true. The first event was his foot slipped off the brake. He had one foot on the brake. Now, he's winding up his car in neutral, or he's winding up his car with one foot on the brake and one foot on the gas. If your car is in park, you don't need to have your foot on the brake. But in any event, because the car was parked, the reason it came out is because his car was parked so close to the thing, he had to back it up. He backed it up. Put it in neutral. Didn't put it back in park. Put it in neutral, supposedly. And what he did is he had one foot on the brake, one foot on the gas, winding up. His foot slides off as his wife happens to just happen to be in front of him and he thought he nudged or hit her. She yells, back it up. He then backs his car up and supposedly, panicked, thought he put the gear shift up and put the gear shift down. From reverse, not into neutral, but into drive. Then the next thing he knows or he realizes is he hits the gas instead of the brake and the tires squeal. I, by no means, am any kind of expert with cars, but I kind of have a general idea of what it necessitates to cause tires to squeal, especially from a standing position in drive. If it was in park or neutral or something like that, it would never cause the wheels to turn. Maybe, I don't know. But in drive, he really had to take and accelerate at a high rate of speed. And based on the injuries that this victim sustained that we've outlined in our brief, which was a fractured vertebra, which in turn tore a hole in her aorta, the pathologist says that that had to be a tremendous amount of force in order for that to happen. So the defendant claims his act was reckless. In my mind, what did he do in this scenario of facts that was reckless? Where is the conscious disregard of a known risk? Basically, his first act of nudging her, accident, his foot slipped off the gas pedal. Totally acceptable. The trial had just gone, but there's an intervening act. The intervening act is backing the car up and stopping it. And what should have happened is that car should have been put in park or what have you. Instead, there's this mistake, and he puts it in drive as opposed to neutral or park. There's a mistake that instead of putting his foot on the brake, he hits the gas. Ramming her through a wall, breaking the stud in the wall, basically almost putting her in the next room. So if the jury were to choose to believe the defendant's version, that would also be, of course, according to what the defendant was trying to say, was an accident. There's nothing reckless about what he did. Did he also say he was trying to play with her? Not the second thing. Even if it was the first time. But if there's an intervening act, that breaks the causal chain right there. So he was trying to take and play with her the first time. How far does that go? How far do those ripples go out? I mean... And, you know, is it determination of what is the intervening act? I mean, is it, in your opinion, just that he then backs up at some point when she says back it up? And then that stops all recklessness and the next time is either accidental or intentional. It's like a whole new series. Because, you know, cases that talk about, you know, what is an intervening act aren't necessarily that easily defined. No, you know, it's not that easily defined. But, again, again, even if you go off the first event, it was either intentional or an accident. The first one, he says there is... Right, but my question, my point is, where is the mental state for recklessness even in the first act? If he was playing with her. That would be, to me, that would be... But what happened was his intent was to play, but what happened is his foot slipped off. He didn't take and nudge her. He didn't do what he wanted. His foot slipped off. Those are his words. That's an accident. But that's the difference in the mental state. He's doing it in the first instance to try and play with her. But what happened is he didn't end up playing with her. His foot slipped. It was an accident. That's disregarding the risk of what could happen, right? To me, a conscious disregard of what could happen, I guess you could take and carry that out to an extreme. I guess the way that I look at it and the way I always kind of keep perspective on recklessness is I did a case a number of years ago where two teenage boys in the basement and one of the teenage boys got his dad's shotgun, thought it was empty, had it pointed at the individual, pulled the trigger, it was loaded. Shot and killed his friend. There was a conscious disregard of a known risk in that case. All of the facts show a conscious disregard of a known risk. Known risk is the gun could be loaded, and if you pulled the trigger, you could hurt somebody. In this case, though, we don't have where he actually nudged her. What we have is we have this other act, even though it was intent, we have this act where he claims his foot slipped. It doesn't say, I nudged her. My foot slipped. He basically has created accident. And again, even if we carry that forward, that still comes down to accident because there's still nothing there for reckless. And what I cited here in my brief, at the supplemental record, supplemental E276 and at 277, the facts of what the defendant said, that the striking of the victim that killed her was not the result of the defendant just wanting to scare her. The defendant actually denied that he tried to scare the victim the second time. So again, even if we were to take a look at that, the problem is we still have that intervening act of him now stopping what he originally did with his original intent, and what he's now done is he basically has started a whole new venture here, so to speak. And in this particular case, there's nothing that he did the second time that bespeaks of reckless. If you accept what he says, the jury had to decide based on the defendant's statements and the other evidence that was presented by the state whether or not there was an accident or whether or not there was an intent to kill. Now how this basically becomes entwined with the second issue is the post-traumatic stress disorder. And I understand what counsel says here with respect to promising something in an opening statement and then not producing it. I don't think there's any case out there that says that that is automatic per se in defense of assistance. It happens. Now in this case, what we have with the post-traumatic stress disorder are a couple of things. Number one, we have to look inside the report. And one of the crucial things here in this report is the fact that what this Dr. Wassilou said, the defendant had said to him, was the fact that the defendant denied any particular stress at the time of the incident. Denied. Now that's at the time of basically striking his wife. Now what happened, what he did after that, what the battalion chief saw and what he claims is post-traumatic stress disorder, yes, the state did try to take and admit what he did in stopping to show a consciousness of what his original intent was, which was what the trial judge in this case at first was very conflicted with because defense counsel, and the state will concede, defense counsel argued ad nauseam to get this evidence in. He argued and argued and argued. When the state finally dropped the domestic battery because defense counsel was not submitting this as evidence of an insanity defense, but rather this post-traumatic stress evidence was limited to explain the stopping to rebut any inference that this conduct somehow expressed his malicious state of mind. Now it wasn't that the post-traumatic stress disorder, what he did wasn't in defense to what he did in the car. He basically admitted no stress at that time. He wasn't acting under post-traumatic stress. So the limited nature of this evidence is clear. When you look at what the evidence was that was brought out and what defense counsel argued, defense counsel argued this closing argument based on what the defendant's statement was and what the evidence was. Defense counsel basically argued that he used the defendant's statement to explain that the post-traumatic stress disorder caused the defendant to react to what had happened. In other words, basically, the defendant said, I reacted to this, I recall doing the stopping, I recall, Senator, because I was agitated, I was basically stressed out, this was post-traumatic, this is what it did to me, this is why I did it. Defense counsel basically argued that. It was exactly the same thing that the expert was going to testify to. So even though he didn't present the evidence, that was not necessarily in the interest of Fisher County because obviously something happened from the time he got it to be admitted. But didn't he need to explain it? I mean, even if he just said, hey, I can do as good a job telling you what it is as this expert, and that's why I'm just not going to bother calling it. I as much as defense counsel, I as much as your honor, I wish he had said something. It would make my job a heck of a lot easier because it would give something that's for a basis here. Now, having said that, I think that there is a question of when you look at the evidence and you look at what the report has and you look at what was adduced, trial counsel, obviously something occurred that changed his mind. When you look at how he argued to get that evidence in and then to come to the judge to see if he represented it. Well, wasn't it when the state's own expert said the stomping on the head was not fatal? This was a murder case. Right. And so she didn't die from having him stomping on her head. Had nothing to do with that. They associated the injuries with that, definitely from the stomping, but it had nothing to do with the death. The death came from the car impact and the tear in the aorta. That's why the PTSD was very limited in what it could actually show, what it could actually take and prove. So something obviously happened. And I don't know necessarily that trial counsel has to take and divulge his trial strategy as a reason why he's not calling a witness. I think that would be a very dangerous precedent to set. Even though I would love to take and have that, I, as defense counsel, would not want to divulge that myself. Thank you. Because that is divulging, if there is a weakness in your case, what's your accuracy of this? So we have that. But even if we assume for the sake of argument, even if we assume deficient performance, deficient because he didn't present it, didn't offer any evidence, and made a comment to the jury, I, like your Honor, I don't see the prejudice. And the reason I don't see the prejudice is maybe not from such a pragmatic point of view, as your Honor, to find a jury to believe this, but from the point of view here of the limited nature to which it was directed. The most that would have done would have just negated a showing of his intent from that act. But it still didn't negate anything he did in the car. It didn't negate anything that happened, it didn't negate any of the inferences from what happened in the car when he stepped on the gas, when the car was in drive, causing the tires to squeal, and ramming his wife into the wall of the garage. Well, to be fair, doesn't his conduct in sight, out of the car, somehow negate any inference that what happened in the car was accidental? A jury could have reasonably concluded that. But I don't see where Dr. Wasserloo's testimony about the PTSD in that is going to really take and make any significant difference in that. And so that's the reason why we argue that there's no prejudice. Now, having said all of that, as an alternative, what we did suggest, based on the third district case in the borough, which is a post-conviction case, they sent it back. If there's a question about the competency of counsel, but a decision that counsel makes, you can't make a decision whether it was trial tactics or whether or not it was ineffective, then the court, in the PC scenario, sent this back. Well, I'm trying to draw upon that here, thinking that instead of guessing, if the court believes that based on the record that there is deficient conduct and you can't tell whether or not it was prejudicial or not, then basically we would suggest sending it back, holding the case in advance and sending this case back for a limited hearing. It would be kind of like a crankle-type hearing, in a way, not truly crankle because you're trying to find out if it was ineffective, but to try to get counsel to take and say on the record why it was that he decided not to call Dr. Wasserloo in order to give substance to whatever termination this court makes. Thank you. I'm going to ask this court to affirm. Thank you. Mr. Warbeck? Please. Thank you. Okay. A couple of key points. A couple of quick points I'd like to make. Number one, I keep hearing about this intervening factor, and I keep seeing it and hearing it. Here's my question. If he's playing with her in the first instance, okay, where he nudges her, bumps her, whatever you want to call it, he's playing with her there, and then seconds later, now we're arguing that he intended to kill her. What changed in those few seconds? What evidence is there that anything changed to change his intent? How did it all of a sudden, in a matter of mere seconds, go from, I'm playing with her, I've got her dead? It doesn't make any sense. Well, your question assumes that he was playing with her. He said he was playing with her. I understand that. The jury was free not to believe everything he said. Certainly. And, again, it goes back to some evidence. The jury should be the one to decide that. All right? Now, the second thing I wanted to bring up. I keep hearing distinction between accident and reckless, and whereas I think there are certainly cases or instances where there is a distinguishing mark between those two cases, I point to the Willett case that I cited in my brief that talks about, if you recall that case, it involves a shaken baby. The man shakes the baby and makes statements that it was accidental. I'm summarizing and paraphrasing, obviously, but makes statements that it was accidental. And there the court found there was evidence based upon defendant's statement that it was an accident, that the act was committed in a reckless fashion rather than intentional. It went down to a reckless conduct in that case. Same thing here. You can call it an accident, foot slipped, bump the gear shift, whatever it is. At the end of the day, it was a reckless act. And, again, I come back to it was reckless because he was playing with a two-ton automobile with his wife. Completely unjustifiable risk doing that in a garage in close proximity, which set off the chain of events making him panic and everything else that led to this horrific accident. Another point I want to make real fast. The state said, or actually it was a question that your Honor asked him, talking about, well, the state doctor said the snapping on the head wasn't fatal, so maybe that was his trial strategy. That's exactly what you tell the jury then. If you didn't call the witness because of what the state doctor said, then pick up that ball and run with it. Ladies and gentlemen of the jury, I know I told you we were going to call Dr. Wassilou on this case, but you heard the doctor testify for the state. She told you that didn't even cause the death. It's something. You have to acknowledge that I know I promised you I was going to play this witness and I didn't call it. You have to at least acknowledge it at some bare base minimum, and he didn't do that. His trial strategy as to why he didn't call the doctor, I still say that doesn't matter. That's not what we're talking about. The issue is the fact that he prejudiced the jury against his own client by not explaining to them how he broke that promise to them, a promise about crucial evidence that was a linchpin of his case. Again, I'll say it again. Little is more damaging than to fail to produce important evidence that has been promised in an opening. In no sense does it serve the defendant's interests. Now I'm going to come back to my last point that I wanted to make on the prejudice issue. Ron was asking me about prejudice, and again, it came up obviously when you were discussing it with counsel. The prejudice, and if you look at the cases, again, that I discussed, Breonis and Liebach, they don't really discuss what the prejudice issue is. They discuss the element that we normally talk about in a strickland situation. They jump right ahead, and while I know and I agree with counsel, I don't think there's anything out there that says failing to call a witness and then not explaining to the jury. I don't think there's anything that says that's per se ineffective. But if you look at those cases that I cited, as well as other cases too, they jump right ahead, and they don't even talk about the prejudice. The prejudice that they're discussing, and let me clarify that, they don't talk about the prejudice in terms of, well, what would that testimony have done for the case. They look at it in terms of, what did you do to this jury? You promised them things. Now you didn't follow through. You didn't tell them why.  Now that affects your client. That's the prejudice. I know I keep repeating myself on this, but I just want to make sure this is clear. That was where the error happened. That's what prejudiced the jury against my client. With that, your Honor's base, that you reverse and remand. Thank you. All right. Thank you, Mr. Warbeck. Mr. Knitovich, thank you also for your arguments here today. This matter will be taken under advisement. Written disposition will be issued.